1808.

MARCH TERM. 1808.

## The Commonwealth *against* MESSINGER and others.

Saturday, March 26th,

*Upon an indictment for stealing a bank note, bill obligatory, &c. evidence of the contents of the instrument may be given, without shewing a notice to the defendant to produce the original at the trial. Under the act of 5th April 1790 which declares that larceny of bills obligatory shall be punished in the same manner as larceny of any goods or chattels, the felonious taking &c. of one bill obligatory is punishable as a larceny.*

THE defendants were indicted in the Quarter Sessions of Northampton county, for feloniously stealing *one bill obligatory* given by *Messinger* to *Cleaver*, and by him assigned to *Henry Abel.* They were tried upon this indictment and found guilty; but a new trial was ordered, because the verdict was taken after twelve o'clock at night of *Thursday*, the court having commenced its session on the preceding *Monday*, and the time of holding and continuing the Court of Quarter Sessions in *Northampton* county being limited by law to *four* days. The indictment was afterwards removed to the Circuit Court, and was there tried before BRACKENRIDGE J. on the 29th *April 1806.* At the trial *Henry Abel* was produced as a witness on the part of the prosecution, and being about to state the contents of the bill obligatory charged to have been stolen, it was objected by the counsel for the defendants that no parol evidence could be admitted to prove the contents of the bill, but that the bill itself should be produced, or evidence given that it was lost or destroyed, or, if in the hands of the defendants as alleged, that notice was given to them to produce it. This objection was overruled by the court, and the following reasons for the opinion were filed of record at the request of counsel, agreeably to the 25th section of the act of 24th *February* 1806. " Overruled " by the court, because this is not a case within the reason of " the principle of the law relative to giving notice to a defend- " ant to produce papers, as it would supervene another great " principle of the law, that no man is bound to accuse himself, " or produce evidence of his guilt. It is alleged that the defend- " ants did take and carry away the paper, which supposes it in " their possession, and out of the power of the Commonwealth " or prosecutor to produce it; the next best evidence is there- " fore admissible, which is the proof offered."

H. H. BRACKENRIDGE.

The defendants were convicted; and on the 30th of *April* their counsel filed the following reason to ground a motion in

1808.

Common-
wealth
*v.*
Messin-
ger.

arrest of judgment. " That at common law no larceny could be " committed of a bill obligatory as laid and described in the in- " dictment. That this indictment if founded at all, must be " founded on the fifth section of an act of Assembly passed on " the 5th day of *April* 1790, entitled 'An act to reform the penal " laws of this state;' but that the charge laid in the indictment is " not within the provisions of the said act, inasmuch as the said " act declares that ' robbery or larceny of obligations or bonds, " bills obligatory, bills of exchange &c. shall be punished in the " same manner as robbery or larceny of any goods or chattels,' " but does not declare or provide that robbery or larceny of *a* " *bill obligatory* shall be so punished." The motion was there- upon made and argued; and it was agreed that an *advisare vult* should be entered, that a motion for a new trial should be con- sidered as having also been made, and that both the question of evidence and the objection to the indictment should be argued in bank.

They were argued accordingly on the 1st and 2d of *Jan-uary* 1808, by *Hopkinson* for the defendants, and the *Attor-ney General* for the Commonwealth, and held under advise-ment until this day when the Judges delivered their opinions.

TILGHMAN C. J. This is an indictment against the defen-dants for felony in stealing a bill obligatory for 175*l.* from *Philip Messinger* to *Jesse Cleaver*, assigned by *Cleaver* to *Henry Abel*.

On the trial of the cause two points were reserved for the consideration of this court.

1. Whether parol evidence was admissible to prove the con-tents of the bill obligatory described in the indictment, without having given notice to the defendants or one of them, in whose hands it was, to produce it at the trial.

2. Whether the taking of one bill obligatory is punishable as a larceny, under the act of 5th *April* 1790, section 5.

As to the first point, the law seems to be settled in *England*, that with respect to proving the contents of writings by parol evidence, there is no difference between civil and criminal cases You are to produce the best evidence that the nature of the case admits of. The paper itself, if in existence, and in the power of the prosecutor, is to be produced; but if it is in the hands of the defendant, notice must be served on him, or his

attorney, to produce it, because otherwise it cannot appear that the prosecutor might not have had the original, if he had chosen to call for it. This principle is established in the cases of *Le Merchant,* 1 *M'Nally* 250. *The King* v. *Aickles,* 1 *Leach* 330. (third edition) *The King* v. *Watson,* 1 *M'Nally* 234. and *Gates qui tam* v. *Winter,* 2 *D. & E.* 306.

So far as relates to all papers, but that which is the *subject of the larceny,* I fully concur with the principle above mentioned; but with respect to the paper which *has been stolen,* a different rule has been followed in *Pennsylvania.* It has been usual to prove the contents of paper bills of credit, before the *American* revolution, and of bank notes since, without giving notice to the defendant to produce them. I am induced to follow this rule the more readily, because no injury can result from it to the defendant. He is informed by the indictment, in what manner the paper in his possession is described, and if it is not truly described, he has it in his power to shew it. This in effect is *notice;* and I think it is for the interest of the defendant to have it so considered. The court have no power to compel him to produce the paper; and the very circumstance of giving him actual notice to produce it may, in case of his not complying, make an impression to his prejudice in the minds of the jury. With regard to other papers, the case is very different. Not being the immediate subject of the prosecution, the defendant may be taken by surprise, having no reason to suppose that they will be brought into question. It is proper therefore in such cases, that no evidence but the paper itself shall be received, unless the defendant having received notice declines producing it. I am therefore of opinion that in the case before us, the parol evidence was properly admitted.

The second point turns on the fifth section of the act of 5th. *April* 1790. It is thereby enacted that " robbery or larceny " of obligations or bonds, bills obligatory, bills of exchange, " promissory notes for the payment of money, lottery tickets, " paper bills of credit, certificates granted by or under the au- " thority of this Commonwealth, or of all or any of the *United* " *States of America,* shall be punished in the same manner as " robbery or larceny of any goods or chattels."

The obvious intent of this law appears to be, to put bonds, with respect to larceny, on the same footing as goods or chattels. They are made the subject of larceny, which they were

1808.

Commonwealth
v.
Messinger.

not before. If larceny of bonds is to be punished in the same manner as larceny of *any goods or chattels*, larceny of one bond may be so punished, because larceny may be committed of a single chattel. When it is said that larceny of bonds may be punished as larceny of *any* goods or chattels, it is saying substantially, that larceny of *any* bonds may be punished. Now if this had been the exact expression, it may be easily shewn by authority, as well as reason, that larceny of *one* bond would have been included.

The statute 32 *H.* 8. *c.* 9. forbids the purchase of *any* pretended rights or titles. In the case of *Partridge* v. *Straunge and Croker*, which was an action of debt on this statute, 6 *and* 7 *Ed.* 6. *Plowd.* 86. Justice *Hales* gave his opinion, which was not contradicted by the rest of the court, that the purchase of *one pretended right* was an offence against the statute, although the words are in the plural number. The statute 23 *H.* 8. *c.* 1. takes away the benefit of clergy from persons who wilfully burn *any dwelling houses*, or rob *any churches or chapels;* My Lord *Hale* takes it for granted, that the burning of *one dwelling house*, or robbery of *one church*, is within the purview of this statute. 2 *H. H. P. C.* 365.

By statute 2 *G.* 2. *c.* 25. *s.* 3. it is enacted that " if any person " shall steal or take by robbery any bank notes, bonds, bills, " promissory notes for the payment of any money," &c. &c. " *notwithstanding any of the said particulars is termed in law* " *a chose in action*, he shall be deemed guilty of felony of the " same nature, and in the same degree &c. in the same manner " as it would have been if the offender had stolen or taken by " robbery *any other goods* of like value" &c. It was determined in *Hassell's* case that the stealing of a single bank note is within the statute. 2 *East. Cr. Law.* 598. 1 *Leach* 1. *S. C.*

By act of Assembly 22d *April* 1794. *s.* 5. any person who shall be convicted of printing, signing, or passing, *any counterfeit notes* of the banks of *Pennsylvania, North America*, or the *United States*, shall be punished as is therein prescribed. It has never been doubted that the printing of *one counterfeit* note is an offence within this act.

Indeed the counsel for the defendant confess that if the expression in the act in question had been *any bonds* &c. the construction must have included *one* bond, because they say the word *any* is put in opposition to *none*. But the word *any* may

with equal propriety be applied to a substantive in the singular or in the plural number; and where it is joined to a substantive in the plural, it certainly has in *strict construction* a plural signification. So that all the cases I have mentioned where *any churches* has been construed *one church* &c. prove that the strict meaning of the expressions has been departed from, in order to comply with the manifest spirit and intent of the law. The truth is, that this objection is founded on a single case, which when examined does not warrant the extensive conclusion attempted to be drawn from it; I mean the case of the statute 1 *Ed.* 6. *c.* 12. by which the benefit of clergy is taken from the felonious stealing of *horses, mares, or geldings.* A doubt arose on this statute, whether clergy was taken from the offence of stealing *one horse,* and to remove the doubt the statute of 2 and 3 *Ed.* 6. *c.* 35. was made. My Lord *Hale's* account of the matter is this, that the doubt was not solely because the statute 1 *Ed.* 6. was in the plural number, *horses, mares, or geldings,* but because the statute 37 *H.* 8. *c.* 8. was expressly penned in the *singular* number: " if any man do steal any horse, mare, foal, or filly;" and then this statute of 1 *Ed.* 6. thus varying the number, and yet expressly repealing all other exclusions of clergy introduced since the beginning of *Henry* 8. made *some doubt* whether it was not intended to enlarge clergy where only one horse was stolen.

Upon a full consideration of the words of the act of Assembly, and of all the authorities which bear upon the point, I am of opinion that the felonious taking of the bill obligatory charged in the indictment, is punishable as a larceny.

YEATES J. The first question to be considered, is whether the admission of parol evidence on the trial of this indictment, respecting the bill obligatory alleged to have been stolen, was erroneous, no notice having been previously given to the defendant to produce it. The general rule is (*a*) that when an original instrument is in the *hands of the party,* against whom it is intended to be given in evidence, no evidence whatever of its contents can be received, until notice has been given to produce it in order to avoid misrepresentation; and it is said, (*b*) that there is no distinction in this particular, between civil and criminal cases. Lord *Mansfield* seems however to have drawn

(*a*) *Peake's Compend,* 70. 71.          (*b*) *M'Nal. Evid.* 348. 350.

a line of distinction between them in (*a*) *Roe* v. *Harvey;* and he lays it down, that in a criminal or penal case, the defendant is never forced to produce any evidence, though he should hold it in his hands in court. The rule is introduced to guard against a false statement of the facts contained in a written paper, and presupposes the possession of the paper clearly in the adverse party. But does it necessarily follow, that the designation of a bill or note as the subject of larceny, draws after it a minute description of its full contents with the date, and the names of the witnesses? And is it consistent with the benevolent spirit of the law, that the stolen goods charged in the indictment for felony, shall be deemed to be in the hands of the party, standing upon his trial for the offence? The presumption of law is directly adverse thereto. Innocence is always supposed, until guilt is duly established. I take the larceny of paper bills of credit made tenderable by particular laws, to be perfectly analogous to the present case: so of bank notes. Numerous indeed have been the instances of indictments for felony in stealing such bills, laying the same in money numbered, both before and since the *American* revolution; and yet it was never thought necessary, that notices should be given to the prisoners to produce upon their trials the bills which they were supposed to have stolen. The ground of guarding against misrepresentation, would equally hold in all those instances; but it will not be asserted that the rule contended for has ever obtained an application in any of them. I conclude therefore, that the admission of the parol evidence in the present case, was strictly regular.

The next question is, whether the stealing of one bill obligatory is a felony punishable by the act of Assembly passed *April* 5th 1790. I fully assent to the established principle, that penal laws are to be construed strictly, and that they are not to be carried beyond their letter. I also am disposed to concur with Dr. *Burn*, who asserts, when speaking of the *stat.* 10 *Geo.* 3. *c.* 18. (the words whereof are, " if any person shall steal any *dog* " or *dogs* of any kind or sort whatsoever, he shall forfeit for the " first offence a sum not exceeding 30*l.* nor less than 20*l.*") that it might be doubtful, whether upon this act it is penal to steal a *bitch.* (*b*) Whether the opinions of the judges on the *stat.* 1 *Ed.* 6.

(*a*) 4 *Burr.* 2489.                    (*b*) 1 *Burn's Just.* 497.

c. 12. which declared " that no person or persons convicted of " stealing horses, mares, or geldings, should be admitted to the " benefit of clergy," (who conceived that it was not sufficient to exclude from clergy any person who should steal *one* horse, mare, or gelding,) was grounded on the words of the statute being merely in the plural number, according to Sir *William Blackstone*, (a) or that they entertained doubts thereon for the reasons assigned by Lord *Hale*, (b) it is immaterial to determine. Dr. *Burn* assigns what he calls a *plain reason* for it. " What a man has a right to (as his life, liberty or estate) by a " clear and undoubted law, shall not be taken from him by a law " less clear and certain." It is sufficient to state that our books teem with authorities, shewing that penal statutes shall not be construed beyond this strict letter. It must be remembered, says Lord *Hale*, (c) that the party indicted must be brought within the *very letter* of the statute. But according to Lord *Mansfield*, (d) there is a great difference between bringing a case within the equity of an act where it is not within the words, and taking a case out of the meaning of an act by an equitable construction, where it is within the words: the first ought never to be done in a criminal case; neither ought the second, if the case be in equal mischief with others, clearly within the meaning of the act. The plain words therefore of the fifth section of the act of 5th *April* 1790, must govern our decision on this question. The intention of the lawmakers must be extracted from their own expressions. The whole must be read together. To every expression must be assigned its true meaning. We have no power to insert and interpolate on the one hand, nor on the other to drop and reject a single word, in order to make the act comport with our private sentiments. A rational construction must be formed on the *toute ensemble*, according to the apparent intention of the legislature as expressed by themselves.

So far then as the section applies to the case under consideration, it will read thus. " Larceny of bills obligatory shall be punished *in the same manner*, as larceny of any goods or chattels." Of the proper signification of the term *any*, there is no dispute. Its natural sense seems to be settled by (a) judicial de-

(a) 1 *Bl. Com.* 87.
(b) 2 *H. H. P. C.* 365.

(c) 2 *H. H. P. C.* 344.
(d) 2 *East's Crown Law*, 592.

1808.
Common-
wealth
*v.*
MESSIN-
GER.

cisions, which we are not at liberty to dissent from, unless they flatly contradict our ideas of right and wrong. It is admitted that *any* is the converse of *none*. But it has been strenuously urged by the defendant's counsel, that the word *any* in the close of the section only relates to the punishment, and that it cannot amplify the preceding descriptive plural words. These cannot in my idea with propriety be termed descriptions of the offences; they contain an enumeration of certain choses in action, which are considered as mere evidences of debts or duties, having no intrinsic value in themselves, and which the lawgivers have made the *general subjects* of robbery or larceny. It may well be asked, if we should not be guilty of a palpable violation of the terms of the law, by adhering to the construction that the stealing of one bill obligatory to any amount whatever is no larceny, and that the stealing of two or more bills of an inferior amount is larceny? The mischief intended to be guarded against, is precisely the same in both instances. Besides, are *all* the words of the law satisfied by such narrowed construction? " Larceny of bills obligatory shall be punished *in the* " *same manner* as larceny of *any* goods or chattels." The stealing of one single specific article is larceny and punishable as such; and by making the larceny of bills obligatory punishable as thefts of any other personal property, the legislature have both in terms and substance enacted, that the stealing of one single specific bill is also larceny. This appears to me to be the true meaning of the fifth section of the act collected *ex visceribus.* I cannot think the present case a *casus omissus;* and upon the whole, I am constrained to say that the defendant might legally be convicted of stealing the bill obligatory laid in the indictment.

SMITH J. concurred.

BRACKENRIDGE J. This was an indictment under the act of Assembly which provides " that robbery or larceny of obliga- " tions or bonds, bills obligatory, bills of exchange, promissory " notes for the payment of money, lottery tickets, paper bills of " credit, certificates granted by or under the authority of this

(a) *Leach. C. L.* 1. *Hassel's case.* 2 *East's C. L.* 598.

" Commonwealth, or of all or any of the *United States* of *Ame-* " *rica,* shall be punished in the same manner as robbery or lar- " ceny of *any goods* or *chattels.*" The securities specified in the act, take their identity much more from the writing than from the paper upon which the writing is made; and it became necessary to establish the written instrument by evidence of the contents. Evidence was offered of the contents by parol. Exception was taken that no evidence could be given of a written instrument, short of the writing itself, where it was in the power of the party to produce it; and if in the power of the adverse party, not unless notice had been given before the trial to produce it. The charge laid in the indictment, one would think, in this case would have been notice sufficient to supersede the necessity of any other notice, taking away all pretence of surprise on the part of the prisoner by the evidence offered; more especially as this had been the second or third time of trying the same fact, and on which trials this evidence had been offered, and it did not appear that it had been excepted against. The exception of not having given notice, was a surprise upon the prosecution. Under these circumstances it would seem unreasonable that the accused should avail himself of it; and I can have no hesitation in thinking that this itself would take the case out of the rule, with regard to notice, supposing it otherwise to apply: but to examine it independent of this circumstance, let us see whether it is a case which required notice to the accused, in order to let in the evidence.

It would seem an absurdity to expect the accused to produce a thing which he was alleged to have stolen; or to say that we should not establish the identity but by the thing itself: that we should not prove the value or the colour of a piece of cloth, until notice had been given to produce the article. "Take notice " that proof will be given of the bay horse charged in the indict- " ment, on your refusal to produce him at the trial;" or, " take " notice that you produce that paper at the trial, with stealing " which you are charged, otherwise evidence will be given of its " contents." I take it that it would be a sufficient answer to the exception, that it is inconsistent with the charge of feloniously taking, to suppose that the accused would furnish any evidence. It is presuming that he has a thing in his possession, which he is charged with *stealing.* I admit there is no difference between criminal and civil cases in this respect; and I take it that in an

*1808.*

Commonwealth *v.* Messinger.

action of *detinue*, or trover, or replevin, where the plaintiff goes for a specific writing or identical paper written upon, the declaration is sufficient notice that it is considered in the possession of the defendant, and that evidence inferior to the writing itself will be given of its contents at the trial. But here we are brought up by an authority, that of Lord *Kenyon*, in an action of trover, where this inferior evidence was offered and over-ruled. It is the case of *Cowan* v. *Abrahams et al.* 1 *Esp. N. P.* 50. It would seem to be directly in point; for according to the report, it was an action of trover for a bill of exchange, which had been picked out of the pocket of the plaintiff's clerk, and traced to the possession of the defendants. The declaration stated the bill of exchange, describing it as drawn and indorsed. The plaintiff proved the possession and loss of the bill, as described in the declaration. The defendants objected to the going into any evidence respecting the bill as set out in the declaration, unless notice had been given to produce it. For the plaintiff it was insisted that it was sufficient to give evidence of any instrument which was his property, as described in the declaration, and which had tortiously come to the defendants' possession; that the plaintiff could only be called upon to prove the averment in his declaration, which he did by the evidence offered, which described the bill of exchange in the defendants' possession, as laid in the declaration. Lord *Kenyon* said that the objection was founded on a rule of law not to be departed from, namely, that the best evidence the nature of the case admits of is always to be given; that wherever there is written evidence, parol evidence of its contents is not the best evidence, and is therefore inadmissible; but that if the party in possession of the written evidence will not produce it when called on, that then inferior evidence is admitted, that is, parol proof of its contents; and that the plaintiff in this case was attempting to give parol evidence of the contents of the bill of exchange, without having given any notice to the defendant to produce the original, which he could not do. On a motion for a new trial, the Court of King's Bench concurred in opinion.

In the above case the declaration stated the bill of exchange, describing it as drawn by *John Harrison*, on *Robert* and *Thomas Harrison*, in favour of *Thomas Bently*, and by him indorsed to the plaintiff in the usual form. *This is to be remarked;* as in a case where the opinion of Lord *Kenyon* was afterwards quoted as an authority before the Court of Common Pleas on this very point,

it was put upon the *particularity* of the description of the bill of exchange in the declaration; and I think it is not difficult to see that the report of *Espinasse* is imperfect, and that the ground of the decision of Lord *Kenyon* does not sufficiently appear; or that the Court of Common Pleas are *astute* in distinguishing and making an apology for his decision. For it would seem to me, the more particular the description, the less reason for notice of what was intended to be proved by evidence on the part of those who had not the possession, and could not be expected to produce the writing itself, but must offer inferior evidence. The case to which I refer, is that of *Bucher et al.* v. *Jaratt.* 3 *Bos.* and *Pul.* 143. It was trover for a certificate in writing of the registry of a certain ship or vessel called the *Salem*, which said ship or vessel had been registered by the plaintiffs. At the trial it appeared that the defendant, having been employed as broker in the sale of the ship by the plaintiffs, had got the certificate of registry in question into his hands, and refused to deliver it at their desire to the person who had purchased of them, so as to enable them to obtain a fresh certificate of registry. To prove that such a certificate had been granted, an officer of the customs was called, who produced the original registry from which the certificate was copied. This evidence was objected to on the part of the defendant, because no notice had been given to the defendant to produce the certificate of registry itself, without which it was insisted that the plaintiffs could not resort to any *secondary evidence* of the instrument which they sought to recover. The evidence however was admitted, and the verdict was for the plaintiffs. A rule *nisi* for a new trial was granted, and the case of *Cowan* v. *Abrahams* relied on; but the rule was discharged by the unanimous opinion of the court. [His Honour here repeated the arguments and opinions in the case of *Bucher* v. *Jaratt*, and referred particularly to the intimation of the court in answer to *Serjeant Best*, who argued for the new trial, that it had not been the practice, and was not necessary upon an indictment for stealing a written instrument, to give notice to the prisoner to produce the instrument, before any evidence could be received of its contents.]

If we examine the cases in the books which have been referred to, or which bear upon the point, we shall find that they are cases of evidence of something in the possession of the party

originally or which had come to his possession, and of which it did not necessarily follow *that evidence would be offered on the trial;* as in *Molton qui tam.* v. *Harris.* 2 *Esp. N. P.* 549. This was an action of debt for a penalty under the statute, for killing game. The defendant pleaded the general issue, and relied that he was qualified by estate to kill game. To prove this qualification, he gave in evidence the payment of rents by several persons who held houses under him, to the extent of the qualification; but all of them appeared to have first become tenants to him from *Michaelmas* 1796. The title under which he claimed this property was (as appeared by the receipts made) a conveyance from a Mr. *Fellowes*, whose niece he had married in the *March* preceding. The counsel for the plaintiff contended, that the conveyance was fraudulent, and done with a view to give him a fictitious qualification to kill game; and that it would appear so by the deed of settlement made on defendant's marriage. To prove the circumstance they called Mr. *Walford*, who was attorney to the defendant; but not being able to get the fact from him, *Garrow* proposed to give in evidence the memorial of the conveyance as registered, and contended, that as the deed was in the hands of the defendant, such inferior evidence would be sufficient. Lord *Kenyon* asked if notice to produce it had been given; and being answered in the negative, ruled that no notice having been given to produce the deed, no proof whatever of its contents was admissible by any other evidence.

It did not necessarily follow, nor indeed can we say that it ought to have been expected by the defendant in this case, that the allegation of fraud would be set up, and that evidence would be offered of the memorial of the conveyance, or of the conveyance itself in this case. It had become matter of evidence in consequence of evidence that had been given, rebutting or repelling evidence in the cause, all which may be unexpected by the person against whom it is produced.

I take it therefore that in the case before us, on general principles, and under the circumstances of the case, the evidence was admissible.

The reason in arrest of judgment comes now to be considered; that the act of Assembly specifies the robbery or larceny of obligations or bonds, bills obligatory, &c. but not of a bill, which was the charge in the indictment in this case. There could be no good reason with the legislature for not making the larceny

of a single bill punishable; because the larceny of a single bill of a large amount might be an equally valuable chattel with many bills of a smaller amount. But if it is a *casus omissus*, a matter not made larceny by express words, or necessary construction, no power inferior to the legislature can make it larceny. For with equal reason it might be said that one horse might be equal in value with two; nevertheless, a doubt arose on the statute of 1 *Ed.* VI. *cap.* 12. *sec.* 10. which in the case of a person attainted or convicted " for feloniously stealing of " horses," " takes away the privilege or benefit of his clergy;" for a subsequent statute of 2d and 3d *Ed.* VI. *cap.* 33, has this preamble: " for as much as it is and hath been ambiguous and " doubtful upon the words mentioned in one act of parliament, " made in the first year of the reign of our sovereign lord the " king, whether that any person being in due form of the laws " found guilty, or otherwise attainted or convicted, for feloni- " ously stealing one horse, gelding, or mare, ought to be admit- " ed to have or enjoy the privilege and benefit of his clergy and " sanctuary; therefore it is declared and enacted by the king, " &c. that all and singular persons feloniously stealing or taking " any horse, gelding, or mare, shall not be admitted &c.; in like " manner and form as though he or they had been indicted for " felonious stealing of two horses, two geldings, or two mares."

By Lord *Hale*, 1 *Pl. C.* 365. the doubt was not singly because the statute of 1 *Ed.* VI. was in the plural number, "*horses, mares, or geldings;*" for then it might as well have been a doubt whether upon the statute of 23 *Hen.* VIII. *cap.* 1. he that had wilfully burned one house should not have had his clergy, because the words in that statute are in the plural number, dwelling houses or barns. But the reason that made the scruple was, because the statute of 37 *H.* 8. *cap.* 8. was expressly penned in the singular number, " if any man would steal any horse, " mare or filly:" and then this statute of 1 *Ed.* VI., thus varying the number, and yet expressly repealing all other exclusions of clergy introduced since the beginning of *Henry* 8., made some doubt whether it were not intended to enlarge clergy where only one horse was stolen. To remove this doubt the statute of 2 and 3 *Ed.* VI. *cap.* 33. was passed, whereby clergy is excluded from him that steals one horse, gelding, or mare.

The doubt would seem to have originated in the humanity of the Judges, feeling the sanguinary nature of the code which

they had to execute, and knowing that the benefit of clergy had been a means of softening it by legislative extension, or judicial construction. Hence we find that a small matter of reading would enable an unfortunate convict to pass in the courts for a clerk, and to claim the privilege of clergy. It may have been under this impression, and from the singular circumstance of the two statutes in *pari materia* varying the expression from the singular to the plural, that the doubt was excited. But it has been correctly observed by the counsel in the argument, that in the statute 23 *H.* 8. *cap.* 1. it is the 'robbing of *any* churches, 'burning of *any* dwelling houses, that is excluded from clergy,' which Lord *Hale* does not take notice of, but omits the word *any* which is used in the statute, and is a distributive numeral word, pointing to the singular of houses, barns, or churches. If there is any force in the word *any*, it is certainly an omission which weakens the analogy of his reasoning. That there is force in it cannot be denied. In the *Anglo-Saxon* the word *an* means one; thence *ane* and *any*. In *Hassel's* case, the indictment under the statute 2d *Geo.* 2. *c.* 25. § 3. (which enacts that " whoever shall steal or take by robbery any exche- " quer bills, &c. shall be deemed guilty of felony,") *charged the stealing one single bank note.* Before the prisoner entered on his defence, it was submitted to the consideration of the court, that the subject of the larceny was not within the terms or intention of the act of parliament; that penal acts were to be construed with great strictness, and could not be made to affect the life, liberty, or property, but according to the literal import. To which it was answered that they must be construed reasonably, according to the common sense of mankind, and the apparent intent of the legislature; that the words were " whoever shall " feloniously steal any bills, &c." and then it goes on to say, " notwithstanding any of these particulars may be termed in " law a chose in action;" which plainly shews that it was the intention of the legislature to make the stealing of a chose in action, which one single bank note is, felony; that the words of 2 and 3 *Ed.* 3. *c.* 33. were horses, &c. and not any horses, and yet it was only *doubted* whether it did extend to *one horse;* that by 22 and 23 *Char.* 2. *c.* 7. it was made felony to burn any ricks or stacks of corn, and yet it had never been doubted but that the burning of one barn was felony within the statute.

The Court, after consulting upon the subject, declared that it was their clear and unanimous opinion that there was nothing in the objection. Whether it was the word *any* that had helped them out, does not appear by the report. But it seems to have been the idea that it was *ex vi termini*, or by the effect of the word *any*, that the plural was narrowed to the singular, or that a singular was considered as within the words. " Though the " statute mentions bank notes in the plural number, yet the " stealing of a single bank note is within it, particularly on ac- " count of the words which follow: " notwithstanding *any* of " these particulars may be termed in law a chose in action."

The effect of the word *any* in the construction of the statute against selling pretended rights and titles, is noticed in *Partridge's* case, 1 *Plow.* 86. *Hales* J. says that a pretended right and title in the singular number is within the penalty of the statute; for the plural number contains in itself the singular number and more; and if one right or title should not be contained here, the effect of the statute would be set aside; and also every right or title is contained in the last branch by this word *any*, and therefore for this reason a right or title in the singular number is within the statute.

In the act of Assembly in this state entitled an act against removing of land marks, 1 *St. Laws.* 5. the word *any* is used: " That no person in this province, or counties annexed, shall " cut, fell, alter, or remove, *any* certain boundary tree, or other " allowed land mark." And in an act entitled an act against effacers of charters, the word any is used: " That whosoever shall " forge, deface, corrupt, or embezzle, *any* charters, gifts, grants, " bonds, bills, wills, conveyances or contracts, shall" &c. In the first act the word *any* is used with the singular word tree or land mark; and in the second act with the plural words charters, gifts, &c. indifferently. Would it not seem from hence that the use of the word was not so marked by them as to be of much import in construing their acts?

But if the word *any* is of such effect provided it is found somewhere attached to the plural words or can be referred to them, we have it here in the very same section and selfsame sentence in which the subject of the larceny is specified, and the penalty affixed: " Robbery or larceny of obligations, &c. " shall be punished in the same manner as robbery or larceny of " *any* goods or chattels." That is, as robbery or larceny of any

goods or chattels is punished, so shall robbery or larceny of obligations, that is, of any obligations. Such ellipses continually occur in ordinary speech; and the language of a statute is like that of ordinary conversation, for it is drawn from it. I would refer to popular phraseology in construing an act of the legislature. " It is the office of the Judges to know the common " language of the people, and their common method of speak- " ing, and to adjudge upon them according to the common " course and understanding of the people of the country." 1 *Plow.* 169. 329. An individual giving notice by advertisement that he meant to prosecute trespassers upon his orchards, gardens, fields, meadows, &c. would think he had made himself to be understood as cautioning against an entry on any one of these; nor could any person be reasonably supposed to understand him otherwise.

But even on the ground of strict construction, I distinguish materially between stealing obligations, and stealth of obligations. The word of (in the *Gothic* and *Anglo-Saxon* af) means consequence, offspring. 1 *Ep. Pter.* 299. The word *concerning* is used to explain it; we say of and concerning, and of or concerning; so that larceny of obligations, means larceny concerning obligations, that is, that species of property which comes under the head of obligations. This I take to be the meaning of the words in so plain and obvious a construction as to render them impossible to be mistaken; and notice of the off ace to all whom it may concern, to what extent punishable, is the principle which ought to govern the construction. I do not think, therefore, it would be justifiable to arrest the judgment in this case.

New trial refused, and judgment
for the Commonwealth.